### BOWLES v. SNEIDER et al. and six other cases.

Nos. 3884, 3885, 3888, 3938, 3970, 4173, 4080.

District Court, D. Massachusetts.

Oct. 10, 1945.

James J. Brennan, Chief of Massachusetts Enforcement Operations, Samuel Winetsky and Benjamin Kaplan, Enforcement Attorneys, O.P.A., all of Boston, Mass., for plaintiff.

David Lasker, of Boston, Mass., for defendants Sneider and others.

Widett & Kruger and Philip D. Keller, both of Boston, Mass., for defendant Brockelman Bros.

George L. O'Hara, of Boston, Mass., for defendants Arns and others.

Widett & Kruger and Harold Widett, both of Boston, Mass., for defendant Cohen.

David Lasker, of Boston, Mass., for defendant Shapiro.

Widett & Kruger and Samuel Goldman, all of Boston, Mass., for defendants Growers Outlet, Inc., and Stadium Packing Co.

SWEENEY, Judge.

In each of these seven cases—five of which were tried together and the other two submitted on stipulations—the Office of Price Administration is seeking an injunction to compel the defendant to comply with Maximum Price Regulation No. 574 as amended, and to prevent the defendant from paying for live cattle any amount higher than the amount permitted by the said Regulation. The cases are sufficiently similar so they will all be disposed of in this one opinion. Although they were originally heard by the Court on the question of a temporary injunction, by stipulation of the parties in open court the evidence submitted on the question of a preliminary injunction will be treated as the basis for the issuance or denial of a permanent injunction.

### Findings of Fact

Each defendant is a slaughterer of cattle operating in the Boston area. His principal source of supply of the live cattle is Chicago and other stockyards farther west. It has been the practice of the defendants to order livestock through a commission man, who is located either at Chicago or at some other stockyard. Some of the defendants, however, have purchased their cattle locally at the Brighton Stockyard and, in a few instances, from individual farmers. Whether or not the purchases were made locally or in the West, the defendants at all times, through their commission men, tried to buy cattle as cheaply as possible and at a price which would permit them to stay within the maximum prices allowed by the Regulation. After the cattle had been purchased in Chicago or at any other stockyard, they were then shipped to the defendants' abattoirs where the animals were killed and dressed. While en route the cattle were fed a limited diet of hay and water and, as a result of this and other factors, their weight shrank and the grade of beef attained may have suffered therefrom. After a carcass had been chilled, a Government inspector then graded the meat.

Without going into the details of the regulations involved, it is sufficient to say that the end sought to be achieved by the Regulation was to get a minimum graded percentage yield out of each carcass dressed by the defendants. It was on the basis of the percentage yield of a particular grade of beef that the permissible price which could be paid for the live animal was established. If, for instance, a slaughterer was able to get the percentage yield of Grade A beef, which was 58%, then the price which he had paid for the live animal complied with the Regulation; if, however, his yield in that same grade was less than 58%, then it automatically followed that the price he had paid for his cattle, even though it was below the ceiling price in the

West, was higher than the permissible price established by the Regulation.

Each month each slaughterer filed a form, DS-T-55, showing actual cost of his cattle, percentage of yield for the various grades, and the permissible price as worked out under the formula set up in the form itself. The following table will show, as to each defendant, the permissible prices, the actual payments, and the approximate percentage of overpayments as drawn from the Forms DS-T-55:

The defendants contend that the overpayments were not willful attempts to evade the regulations. They point out that the overpayments were relatively small and that they were a direct result of an unnatural wartime condition. For example, they say that in normal times the shrinkage of cattle can reasonably be estimated where the scheduled running time of the railroad carrying the cattle is adhered to closely; but that, due to the war burdens imposed upon the railroads, it was impossible to es-

|  | Highest permissible price | Actual price paid | Percentage of overpayment |
|---|---|---|---|
| ARNS |  |  |  |
| February | $ 10,459.29 | $ 10,821.20 | 3½% |
| March | 13,133.47 | 14,623.19 | 11% |
| April | 8,471.45 | 9,284.36 | 9% |
| SNEIDER |  |  |  |
| April | 39,319.45 | 43,592.05 | 11% |
| COHEN |  |  |  |
| May | 55,547.72 | 55,936.19 | .07% |
| April | 62,073.47 | 63,403.80 | 2% |
| BROCKELMAN |  |  |  |
| May | 35,842.36 | 36,843.79 | 2.8% |
| SHAPIRO |  |  |  |
| April | 101,181.26 | 107,781.00 | 6.5% |
| January | 123,305.25 | 130,870.00 | 6.1% |
| GROWERS OUTLET, INC. |  |  |  |
| April | 3,827.45 | 4,099.12 | .07% |
| May | 7,116.29 | 7,335.82 | .03% |
| STADIUM PACKING CO. |  |  |  |
| March | 39,352.75 | 40,293.31 | 2½% |
| April | 38,128.78 | 38,451.04 | .08% |
| May | 33,167.69 | 34,398.97 | 4% |
| July | 27,226.93 | 27,933.90 | 2.5% |

Since the only evidence offered against these defendants covered the months above enumerated, I am assuming, for the purpose of disposing of the plaintiff's prayers, that in all of the other months, at least up to the time the cases were heard, these defendants had been in compliance with the regulations. The figures shown above are drawn from the defendants' own records and there is no contention that the figures are not accurate. In fact, the defendants admitted in open court that the overpayments shown above had been made. The defendants likewise do not attempt to question the validity of the regulations.

timate the amount of delay beyond the regular schedule in any given case. They further urge that, not only did extra shrinkage result from the delay in transit, but that the cattle were bruised to a greater extent than in normal times, and that excess bruising brought about excess loss of weight because the bruise had to be cut out before the meat was salable. They also contend that the months in question, which generally cover the spring period, were not fair tests of the methods by which they did business because it was in this season that the cows were heavy with calves.

However, the Government insists that it is possible for these defendants to ascertain weekly, or at least bi-weekly, whether or not there is danger of their being out of compliance during that monthly period, and that if these defendants had taken the trouble to ascertain at least a week ahead of the termination of the period for which they were reporting that they were close to the line, they might then have arranged their purchases for the rest of the period so as to bring them in compliance for the entire period.

It has been brought to my attention by the defendants that several courts have refused to grant the type of injunction that is sought here on the basis that it had not been shown that the defendants were not making an earnest effort to comply. Those cases seem to turn upon the question of the good faith of the slaughterers. See Bowles, Adm'r, v. Glauser, D.C.E.D.Mo., 61 F. Supp. 428; and Bowles v. Bonne Terre Farming & Cattle Co., D.C.E.D.Mo.[1] and Bowles, Adm'r, v. Rice et al.,[1] from the Eastern District of Kentucky.

■ With due respect to the writers of the opinions in the above cases, I cannot agree that the sole test of whether the injunction should issue is the question of good faith on the part of these defendants. The statute which authorized the promulgation of the regulations in question was a wartime emergency statute, designed not only to assist in the direct prosecution of the war, but also prescribing a course of conduct for slaughterers which was best calculated to provide for the even distribution of the necessities of life to the civilian population. The course of conduct prescribed was one to be followed not only by the individual slaughterer, but by his competitors as well. To excuse deviations from this prescribed method of doing business can only operate to produce a chaotic condition in the purchase, sale, and distribution of meats. The injunction sought is not leveled at the collection of damages or the collection of any penalty, directly or indirectly; the injunction sought merely would compel a careless slaughterer to adhere to the prescribed method of conducting his business. The percentages of overpayment in these cases range from less than 1% to more than 11%. I am of the opinion that these defendants could have so conducted their businesses as to maintain strict compliance with the regulations.

While such compliance might have to be attained by a more rigorous attention to their purchases, and might even be a source of expense to these defendants, nevertheless the over all picture of the end sought to be attained by the statute and the regulations, and the absolute necessity for strict compliance with the regulations, call for the issuance of injunctions in these cases.

### Conclusions of Law

I find and rule that these defendants have not been in compliance with Maximum Price Regulation No. 574 as amended, and that they have been paying for live cattle an amount higher than the amount fixed by said Regulation for such cattle during the accounting periods. The plaintiff is entitled to a permanent injunction against these defendants to insure full compliance with Maximum Price Regulation No. 574 as amended.

The decrees may be submitted in accordance with the above.

---

[1] No opinion for publication.